MATTHEW T. AND BETTY A. ST. CLAIR, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
St. Clair v. Commissioner
Docket No. 1139-71.
United States Tax Court
T.C. Memo 1976-30; 1976 Tax Ct. Memo LEXIS 371; 35 T.C.M. (CCH) 118; T.C.M. (RIA) 760030; February 4, 1976, Filed Matthew T. St. Clair, pro se. [1]
Richard D. Hall, Jr., and Frederick T. Carney, for the respondent. DAWSON
MEMORANDUM FINDINGS OF FACT AND OPINION DAWSON, *372 Chief Judge: This case was assigned to and heard by Special Trial Judge Randolph F. Caldwell, Jr., pursuant to Rules 180 and 182, Tax Court Rules of Practice and Procedure. The parties have filed no exceptions of law or fact to Special Trial Judge Caldwell's report. The Court agrees with and adopts his opinion which is set forth below. OPINION OF THE SPECIAL TRIAL JUDGE CALDWELL, Special Trial Judge: The present case is one of a group of 37 which were consolidated for trial, but not for opinion. At the trial, evidence was received which bears upon every case in the group. This evidence relates to certain contractual arrangements between the husband-petitioners' employers (Lockheed Air Service Company and Dynalectron Corporation) and the United States Air Force, as well as the employment arrangements between field team members (such as the husband-petitioners) and such employers. Respondent determined a deficiency in petitioners' 1969 Federal income taxes in the amount of $223.01. In an amendment to his answer to conform the pleadings to the proof, respondent seeks an increased deficiency in the total amount of $748.56, or an increase of $525.55 over the amount determined *373 in the statutory notice. The issue is whether all or any portion of the $3,716 of per diem payments received by petitioner Mattew St. Clair (hereinafter, "petitioner") from Dynalectron Corporation should be included in his gross income for 1969 under section 61(a) of the Internal Revenue Code of 1954; [2] and, if so, whether petitioner is entitled to deduct any or all of said amount as away-from-home traveling expenses under section 162(a)(2). FINDINGS OF FACT Petitioners, husband and wife, filed their 1969 return with the Internal Revenue Service Center at Chamblee, Georgia. Petitioners resided at Meridian, Mississippi, at the time of filing their petition. During 1969 petitioner was employed as a member of two different field teams by Dynalectron Corporation (hereinafter, "Dynalectron"). Dynalectron, as well as Lockheed Air Service Company (hereinafter, "Lockheed") had a contract with the United States Air Force during 1969, to provide field team services for the maintenance and modification of weapons systems (i.e., aircraft) and/or support equipment. *374 These contracts were called "basic contracts" and the Air Force entered into such a contract with each of three different contractors. The contracts were for three years maximum duration, and those involved here were for the three fiscal years, July 1, 1967-June 30, 1968; July 1, 1968-June 30, 1969; July 1, 1969-June 30, 1970. The contract was firm for the first of the three years; but the Air Force had the unilateral right to extend the contract for the second and third years of the three-year period. The contracts were so extended by the Air Force insofar as both Lockheed and Dynalectron were concerned. (The record herein does not identify the third contractor who had the basic contract.) The basic contract did not, of itself, award any work to be performed thereunder. It did specify the wage rates which would be paid for services rendered by employees of the contractor, if the contractor got work to be performed under the contract. The contract also contained the following provisions relating to the payment of per diem: (ii) Per Diem, not to exceed the applicable amounts set out below, when actually paid by the Contractor and approved by the Administrative Contracting Officer, *375 shall be reimbursed to the Contractor, without regard to the duration of the assignment; provided, however, that no per diem shall be authorized or paid to any employee whose actual residence is within 50 miles of the work station to which the employee is assigned, nor shall any per diem be paid to any employee who actually resides at and commutes from his actual residence during the period of his employment, regardless of the distance between said residence and his assigned work station: (See (ii)(e) below). (a) In the CONUS (No quarters and messing facilities furnished by the Government)-- $11.00-Per day per man for Engineer and Leadman and $9.00-Per day per man for the remainder. * * * * *
(e) For the purpose of this contract the term "actual residence" is defined as the fixed or permanent domicile of an employee. The employee shall certify to the location of his fixed or permanent domicile and this location, if accepted by the Contractor, shall be deemed, for the purpose of this contract, to be the employee's domicile in so far as per diem authorization against this contract is concerned. However, this does not relieve the Contractor of his responsibility to ascertain *376 that the certification is valid. The opportunity for the contractor to perform under the basic contract arose from the issuance by the Air Force of a work order thereunder. Issuance of a work order was entirely within the discretion of the Air Force, and it alone had the discretion to select which one of the three holders of a basic contract that was to perform the work order. Performance under a work order might be at any place in the United States or at any place overseas where the Air Force maintained a base. Under the terms of the basic contract, work orders could only be issued during a given year of a basic contract. However, completion of a work order actually issued during such year might be effected after the end of the year. When the Air Force had determined to issue a work order and had notified a contractor of its selection to perform that order, representatives of the Air Force and of the contractor would get together at a "pre-dock" meeting where the time for completion of the contract and the make-up of the contractor's projected field team complement would be worked out. Determination of the time of performance entailed fixing an input-output schedule -- the schedule *377 which showed the number of units coming into the contractor for its maintenance and modification services per day or week or month, and the number of units to be completed by the contractor per day or week or month. After the projected field team complement had been worked out, the contractor would then proceed to get the team together. In assembling the team, the contractor would utilize two sources of manpower: (1) existing employees which it transferred from jobs under other work orders; and (2) new employees which it recruited. Whenever a contractor hired a new employee for field team work, that employee was advised that he was subject to being sent anywhere that the contractor might be called upon to perform a work order, and that if the employee was unwilling to travel where thus directed to go, his only alternative was to resign. The employee was also advised that the contractor only had a basic contract for a year and that it had no way of knowing whether or when it would receive work orders under that contract. It was also made clear to the employee that, while the contractor would endeavor to continue to utilize the services of the employee after completion of the work *378 order in connection with which he was hired, it could not guarantee any such further employment; and if none were available, the employee would be laid off. Neither Lockheed nor Dynalectron maintained any pool or central area where an employee who had completed an assignment could be sent pending the contractor getting another work order on which such employee could be used. Both Lockheed and Dynalectron were involved in the performance of work orders at Key Field in Meridian, Mississippi, during the years involved. [3]Lockheed had first come to Meridian in 1965 and it remained there until June 30, 1969, at which time (although it did not lose its status as holder of one of the three basic contracts) it was supplanted by Dynalectron. During the fiscal year ended June 30, 1969, Lockheed received two work orders to be performed at Meridian; and during the succeeding fiscal year, Dynalectron likewise received two work orders. While in most instances, the contractor's field teams were sent to the location where the aircraft were located, in the case of the work orders performed at Meridian, the aircraft were brought by the Air Force to that work site from other locations. *379 During the performance of a work order, the Air Force always had an on-site representative, monitoring the performance of the contractor. One of the areas of concern was to determine whether the field team was over strength or under strength, as well as the quality of work of the field team members. Instances occurred when the composition of the field team was changed as the result of the recommendation of the Air Force's on-site representative. For this reason, as well as for the reason that the composition of the field team varied according to the nearness in point of time to the beginning or the end of the performance under the work order, the projected field team complement as worked out at the pre-dock meeting might vary as much as 10 to 20 percent during the performance of the contract. When an employee was hired, or rehired, by a contractor, he was required to certify to the contractor his "permanent or domicile" address (in the case of Lockheed) or his "fixed or permanent domicile" (in the case of Dynalectron). If the address so certified was further than 50 miles from the job site where the employee was to work and if the employee did not drive back and forth to work, *380 irrespective of the address which he had furnished, he was paid the per diem mentioned and described above. The per diem payments made by the contractors were included in their invoices to the Air Force, solely for the purpose of being reimbursed. There was no element of profit to the contractors in the per diem for which they sought reimbursement. Per diem paid to the field team employees who qualified therefor was at the rate of $11 per day for a leadman and an engineer, and $9 per day for the other members of the field teams. Per diem was paid for seven days per week, although the regular work week for field team members was a 5-day, 40-hour week. Field team members also received per diem during their initial travel to a work site, for days of travel when transferred to different work sites, and for a maximum of three days for return to their homes, in the event they were laid off. They did not receive per diem during vacation periods; but they did receive per diem for three days up to a maximum of six days if they were sick. Neither Lockheed nor Dynalectron withheld Federal income tax from the per diem payments made to their employees. After petitioner graduated from high *381 school at Salem, Illinois, his birthplace, he enlisted in the Armed Services of the United States. Upon his discharge in May 1966, he went to work for an aircraft manufacturing concern in St. Louis, Missouri. In 1966, faced with the prospect of an impending layoff, petitioner answered an advertisement placed in a St. Louis newspaper for field team members. Following an interview in St. Louis, petitioner was hired by Dynalectron as an aircraft mechanic; and on or about October 30, 1968, he was sent to join a field team at Webb Air Force Base in Big Spring, Texas. Thereafter, on or about January 10, 1969, Dynalectron assigned petitioner to work for six months with a field team in Vietnam. On or about July 10, 1969, petitioner returned to the United States, and after a leave of absence of about one month, Dynalectron assigned him to Key Field in Meridian. He was informed by Dynalectron at that time that the Key Field assignment would be for no more than two or three months because the company was anticipating the receipt of work orders for field team services in England. Petitioner was not sent to England. However, in November 1970, Dynalectron did send him back to Vietnam, where he *382 remained until mid-January 1971. He was then assigned back to Key Field where he was still employed as a field team member by Dynalectron at the time of the trial in July 1972. Petitioner married his wife Betty in October 1964, and they were married throughout 1969. They were the parents of one son, Michael. When petitioner left Big Spring, Texas, for his six-month 1969 assignment to Vietnam, Mrs. St. Clair and Michael went to reside with petitioner's parents who lived in Salem, Illinois. They remained with the parents until petitioner returned from Vietnam, and paid the parents $22.50 per week plus other incidental household expenses during their stay. Mrs. St. Clair and Michael paid a short visit to her parents in Beatrice, Nebraska, while petitioner was on his first tour of duty in Vietnam. When petitioner joined Dynalectron, he advised the company that his "fixed or permanent domicile" was 715 South Washington Street, Salem, Illinois. That address is the home of his parents. As mentioned above, Mrs. St. Clair and Michael resided in Salem with petitioner's parents while he was in Vietnam in 1969. Petitioner has not lived in Salem or worked there (except for a short period *383 of time) since he entered the Armed Services in May 1962. Petitioner has stored a sofa, some other furniture, and some of his tools at his parents' home. Petitioner, acting through his wife, purchased an automobile from a dealer in Centralia, Illinois, (about 20 miles from Salem) with funds borrowed at a Salem bank, in May 1969, while he was in Vietnam. He also opened a checking account at a Salem bank at or about that same time. Petitioner gave the Washington Street address in Salem as his address when he applied for a passport prior to going to Vietnam in early 1969. He was registered with the Selective Service local board in Centralia, Illinois. When petitioner was assigned by Dynalectron to Key Field in Meridian in August 1969, Mrs. St. Clair and Michael came with him. They have lived in a rented house with rented furniture. Mrs. St. Clair obtained employment (not with Dynalectron) when she came to Meridian. Petitioner put Mississippi license plates on his car and obtained a Mississippi driver's license in the fall of 1969. Petitioner received per diem payments from Dynalectron during 1969 in the aggregate amount of $3,716 -- $2,591 for the time he was in Vietnam and $1,125 *384 for the time he was in Meridian. He did not include any amount of per diem in income on his 1969 return. In his notice of deficiency, respondent included $1,188 of per diem payments in petitioner's gross income. By amendment to his answer, respondent has sought to have included in petitioner's gross income for 1969 an additional $2,528, and has sought an increased deficiency for that year. OPINION The first and principal issue in this case is whether respondent correctly included in petitioner's gross income the per diem payments which he received from Dynalectron. It is believed that the per diem payments when received by petitioner constituted gross income at the time of their receipt. Section 61(a)(1), in very broad and sweeping language, provides that "gross income means all income from whatever source derived." The Supreme Court has construed this "broad phraseology" as evincing a Congressional intention "to tax all gains except those specifically exempted." Commissioner v. Glenshaw Glass Co.,348 U.S. 426, 430. The per diem payments were "undeniable accessions to wealth, clearly realized and over which the [petitioner had] complete dominion." Commissioner v. Glenshaw Glass Co.,supra, p. 431. *385 There is no exemption for per diem payments contained in the Code. Manifestly, then, the respondent was correct in including them in petitioner's gross income. Leo C. Cockrell,38 T.C. 470, 477-478, affd. (8th Cir.) 321 F.2d 504; Darrell Spear Courtney,32 T.C. 334, 341. [4]
However, sustaining the respondent's inclusion is not the end of the matter. There is still the question whether petitioner is entitled to deduct any part or all of the per diem payments under section 162(a)(2) for expenses of travel while away from home which he incurred in connection with the performance of his duties as an employee. Leo C. Cockrell, supra, p. 479. The Supreme Court in Commissioner v. Flowers,326 U.S. 465, rehearing denied 326 U.S. 812, laid down three requirements that a taxpayer must meet to be entitled to deduct away-from-home travel expenses: The expense must be reasonable and necessary traveling expense; it must be incurred by a taxpayer while away from home; and the expense must be incurred in pursuit of business. The parties *386 in the present case are apart only on the question of whether petitioner was "away from home." In the case of Truman C. Tucker,55 T.C. 783, 786, the factors to be considered in determining whether the taxpayer should be treated as away from home for tax purposes were crystallized. It was there said: The purpose of allowing the deduction of living expenses while a taxpayer is "away from home" is "to mitigate the burden of the taxpayer who, because of the exigencies of his trade or business, must maintain two places of abode and thereby incur additional and duplicate living expenses." Ronald D. Kroll,49 T.C. 557, 562 (1968). In furtherance of this purpose, when a taxpayer with a principal place of employment goes elsewhere to take work which is merely temporary, he may deduct the living expenses incurred at the temporary post of duty, because it would not be reasonable to expect him to move his residence under such circumstances. Emil J. Michaels,53 T.C. 269 (1969); Ronald D. Kroll,supra.For this purpose, temporary employment is the type which can be expected to last for only a short period of time. *387 Beatrice H. Albert,13 T.C. 129, 131 (1949). On the other hand, if a taxpayer chooses for personal reasons to maintain a family residence far from his principal place of employment, then his additional traveling and living expenses are incurred as a result of that personal choice, and are therefore not deductible. Commissioner v. Flowers,supra;Ronald D. Kroll,supra, at 561-562; Floyd Garlock,34 T.C. 611, 614 (1960); Mort L. Bixler,5 B.T.A. 1181, 1184 (1927). Similarly, if a taxpayer accepts indefinite employment outside the vicinity in which he lives, but he does not change his family residence, the travel to his new place of employment and the additional living expenses which he incurs there result, not from his employment, but from his decision not to move his residence. Rendell Owens,50 T.C. 577 (1968); Maurice M. Wills,48 T.C. 308 (1967), affd. 411 F. 2d 537 (C.A. 9, 1969). Thus, the deductibility of traveling expenses and duplicate living expenses depends upon the ultimate question of whether the taxpayer under all the circumstances, *388 could reasonably have been expected to move his residence to the vicinity of his employment. Measured by the foregoing, it is believed that petitioner must be held to have been away from home during 1969, while on the Vietnam assignment but not when he was on the Meridian assignment. Respondent agrees that the Vietnam assignment was only temporary, but he contends that the Meridian assignment was indefinite. It is believed that respondent's contention as to the Meridian assignment is not correct. Petitioner was told by Dynalectron that his assignment to Meridian would only be for two or three months. His previous stateside assignment had only been for the short period of October 1968 to January 1969, when he was sent on the six-month Vietnam assignment. These factors, coupled with the arrangements between Dynalectron and the Air Force lead to the conclusion that petitioner was justified in treating his Meridian assignment during the year 1969 as only temporary. Respondent correctly urges that an assignment to a post of duty which is temporary in its inception, may, with the passage of time, be transformed into an indefinite one. But, during 1969, that point in time had not been *389 reached as far as petitioner was concerned. The result is that both of petitioner's 1969 assignments should be treated as temporary. The question remains though, whether petitioner was "away from home" during these temporary assignments. It is believed that, during his Vietnam assignment, when he sent his wife and child to live at the home of his parents in Salem, Illinois, that Salem qualified as petitioner's home. He paid his parents a fixed amount each week plus other incidental household expenses. In addition, it is reasonable to believe that his wife and child had other expenses beyond those just mentioned. The point is that, during his Vietnam assignment, petitioner did incur those duplicate living expenses, the burden of which, as the Court stated in the Tucker case, section 162(a)(2) was designed to alleviate. Petitioner, in Vietnam, was of course away from that home. The situation, however, is different insofar as petitioner's Meridian assignment is concerned. When petitioner went to Meridian, he took his wife and child with him. He no longer incurred duplicate living expenses. With his wife and child making their home with petitioner in Meridian, his place of employment, *390 that city, and not Salem, Illinois, where his parents lived, became his home. He was, therefore, not "away from home" within section 162(a)(2), during his 1969 Meridian assignment. Petitioner should be allowed a deduction under section 162(a)(2) of $2,591 (an amount equal to the per diem he received while in Vietnam), but not for $1,125, (an amount equal to the per diem he received while in Meridian in 1969). * * * * *
In accordance with the foregoing, Decision will be entered under Rule 155.
Footnotes
1. DeQuincy V. Sutton was counsel of record for petitioners at the time of trial. Mr. Sutton died in August 1974, shortly after the last brief was filed. There is presently no counsel of record for petitioners.↩
2. All section references herein are to the Internal Revenue Code of 1954 unless otherwise specified.↩
3. The petitioner-husband in the present case, as well as all the other husband-petitioners, worked at Key Field in Meridian. It is this work at Meridian that is the common element that prompted the consolidation of the cases for trial.↩
4. See also Fred W. Phillips,T.C. Memo. 1973-58↩.